# EXHIBIT W

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Elliott Ambrosio and Sierra Trenholm, on behalf of themselves and all others similarly situated,<br><br>                      Plaintiffs,<br><br>  v.<br><br>Progressive Preferred Insurance Company and Progressive Advanced Insurance Company,<br><br>                      Defendants. | Civil Action: 2:22-cv-00342-PHX-SMB |

**EXPERT REPORT OF KIRK FELIX**

      My name is Kirk Felix, and I make the following declaration freely, voluntarily, and based on personal knowledge. If called to testify on the issues discussed herein, I can and would do so competently. Pursuant to 28 U.S.C. § 1746 and Fed. R. Civ. P. 26, I declare as follows:

**I.     Qualifications**

      I have worked in automotive management since graduating college in 1986. A full copy of my resume is attached as **Exhibit 1**. As reflected therein, for the first 13 years of my career, I worked directly in dealerships managing fixed operations departments for Acura, Honda, and Toyota, such as service and parts. In those roles, I was responsible for the daily operation of the service and parts departments and would work directly with used car managers on reconditioning and pricing used cars. While working in fixed operations, I worked closely with all departments of the dealership to focus on overall dealership volume and profitability. This included meetings and training of all aspects of dealership operations.

      From 1999 until my retirement at the end of August 2022, I was an automotive consultant and moderator with NCM Associates, Inc. At NCM, I ran 20 Groups, which is a peer collaboration business model where groups of 20 dealerships from around the country that do not directly compete with each other are brought together to analyze each dealership's data and provide strategic advice on ways to improve the dealership's business and finances. Each 20 Group meets in-person for one-and-a-half to three days several times a year. During the 20 Group meetings, we discuss industry trends and best practices for operating efficient, profitable dealerships, with the goal of improving the dealerships' performance and maximizing profits. At the same time, these 20 Group meetings entail detailed reviews of the participating dealerships' financial performance, resulting in an analysis that tracks their performance in 1,000+ metrics compared to dealerships from across the United States, including volume, sales amounts, gross profit, expenses, and net

profit. NCM produces over 35 pages of detailed financial comparisons monthly for each 20 Group. Because of the timeliness of the data, it reflects current market and dealership performance. As a 20 Groups moderator, I was responsible for analyzing the financial composites for lost profit opportunities.  I was tasked with leading meeting discussions and analysis on all aspects of the dealerships' businesses, which included topics ranging from new cars, used cars, finance and insurance, service departments, parts and collision departments, personnel productivity, inventories, etc. As the moderator, I also assisted 20 Group members in staying in contact in between the in-person 20 Group meetings, so participants could provide real time review and feedback to one another on the financial composite and their performance. Over the years, I have worked with more than 300 dealerships through the 20 Groups, including Chevrolet, Chrysler, Ford, Nissan, and Honda dealers, two fixed operations director groups, an Independent Auto Auction group, as well as many others. These dealerships include dealerships in over 45 states, including, for example, Arizona, California, Colorado, Utah, Nevada, New Mexico, Kansas, Wyoming, Nebraska, Oklahoma and Texas.

Within NCM, the consultants and moderators meet twice a year to discuss industry trends and best practices. During my time at NCM, there have been at least 10 moderators and more recently 22 to 24. At any given time, NCM moderators and consultants are working with 2,600 to more than 3,300 dealerships throughout the United States.

A recurring topic in mine and other moderators' 20 Groups has been adapting to changes in the industry brought about by the internet. Inside dealerships, the internet has changed the pricing practices by enabling dealers to have access to constantly updated market data, such as through pricing and inventory management tools like V-Auto. Dealers throughout the nation adopted these tools to be able to accurately determine the market price for a vehicle they were taking into inventory and, working backward from that price, determining a price at which they could purchase the vehicle and recondition it for retail sale. On the consumer side, the internet provides a much more transparent market where consumers can easily compare vehicles across competitors. Dealers expect consumers to make those comparisons and have to price their inventory accordingly if they are going to turn it. Based on my experience, pricing to market is the norm in the modern used car industry.

## II.     Materials Reviewed

- Plaintiffs' Valuation Reports
- Second Amended Class Action Complaint
- Graphs of data analysis by Dr. Jeffrey Martin and Dr. Michelle Lacey

## III.    Summary

I have been asked to offer my opinions on pricing and selling of used vehicles in the used auto market industry. Specifically, I have been asked for my opinion on whether used vehicles generally or are likely to sell for an amount lower than their Internet price (a term I used interchangeably with "list price" and "advertised price"), and if my opinion depends on whether the consumer is paying cash versus financing the vehicle through the dealership. In my opinion,

2

because of Internet advertising and shopping, "comparison tools" available to consumers when shopping for used autos, and state-of-the-art sophisticated pricing tools or software, vehicles are priced to market and used car dealers do not deviate down from the advertised cash price, with limited exceptions that are not related to the market value of the car, but rather related to add-on products or how the transaction is structured or financed. Before the adoption of these pricing tools, it was fairly common in the used auto market for dealers to advertise vehicles at an above-market price and negotiate down from that price. That is no longer true, and has not been true for (conservatively) over a decade.

In this Report, I'm using "cash purchase" to include vehicle sales where the customer gets his own private lending. In financed used car sales, customers either get financing through the dealership—where the dealer has a preferred lender or shops for various potential loans and gets points on the interest—or can secure their own, private loan without the dealership's help. In the latter situation, it is, to the dealer, essentially a "cash purchase," because it is not receiving any portion of the finance amount or charges. It's just that the cash is coming from a third party rather than from the customer.

I'm using "market price" or "market value" or "true market price" interchangeably and with the meaning that it has in the used auto industry, based on my experience and knowledge. These terms essentially mean what a given vehicle will sell for in a cash transaction absent extenuating circumstances.

IV.     **Opinions**

   1. **Pricing and Selling of Vehicles in the Used Auto Market.**

   I will begin by describing the evolution of the process for pricing and selling used autos based on my experience, expertise, and knowledge of the industry.

   Prior to at least 2012, car dealers engaged in a "costs up" pricing and selling practice. Under this pricing practice, the dealership would acquire a vehicle from auction, trade in or a private seller. If needed, they then might recondition the vehicle mechanically or cosmetically. These costs along with additional costs for shipping and various expenses, such as auction fees, would be the total cost of the vehicle. The dealership would then add a standard "mark up" in the amount it wanted in profit when the car was sold. The dealership would set this mark up from $1,000 - $10,000 depending on the market, the vehicle, and the dealership business model.  In calculating the mark up, the dealership would build in room for negotiation during the sales process. This pricing process was driven by the profit the dealer wanted to realize, not by the retail market. This model was possible because it was difficult for customers to compare pricing of similar vehicles across competitors, as that data did not exist for the consumer. The only resources available to the customer were newspaper classified ads, or physically visiting dealerships to compare vehicles. This process provided limited information and was extremely time consuming.

   During this time, dealers used wholesale pricing information available in the form of various pricing books (NADA, Blackbook, etc.). The main use of this data was to aid dealers in vehicle purchase valuations. However, the information was dated, only available to those that paid

3

for it and based mostly on auction, or wholesale valuations. None of this information was available to the customer, so there was no transparency in the market for the typical consumer.

Unlike the non-transparent "costs up" pricing model, used car pricing in today's market is data driven. With the growth and availability of the internet to the masses, customers can compare vehicles and pricing online in real time. The data is current market data and available to customers online within a matter of minutes. They can compare vehicles and pricing online with accuracy that would have been impossible prior to the internet and pricing software.

Thus, the Internet changed the traditional car buying process. In today's market, car dealers acquire vehicles and know the price they will market the car for. Dealers now need to purchase the car at a large enough discount from the market price to allow for reasonable profit levels. A common phrase among dealers is that they make their profit when they purchase the vehicle, not when they sell it.

Car dealers generally acquire used autos through auction or a trade-in from a consumer.[1] In both cases, however, the process is the same. Car dealers use sophisticated and data-driven pricing software (V-Auto, as an example, but there are others) to determine the amount for which a given vehicle would be priced. This pricing software provides the amount for which comparable vehicles have been or are listed for sale, within the parameters set by the dealer (for example, a dealer would look at vehicles currently listed for retail sale within "30–50 miles" or any other given number). The used car dealer then estimates the amount of any "reconditioning" cost that will need to be put into the vehicle to make it ready for sale. The amount at which the vehicle will be priced, minus the estimated reconditioning cost and a given profit margin, determines generally the amount the car dealer can spend to acquire the vehicle.

To give a concrete example, assume the car dealer is considering purchasing a vehicle at auction. Assume the car dealer uses the pricing tool and determines the market price at which the vehicle can be listed is $20,000.00. Assuming the estimated re-conditioning cost will be $1,500.00. The car dealer would likely be willing to purchase the auction vehicle for $15,000.00, because he would expect a $3,500.00 profit. He likely would not be willing to purchase the vehicle for $18,500.00, because he would not expect any profit. How far under $18,500.00 the car dealer would be willing to spend depends on what expected profit margin the car dealer requires.

What this means is that before the car dealer even buys a vehicle at auction (or agrees to as a trade-in), the dealer knows exactly how much the vehicle will be listed at, i.e., its market price. That price IS the price. Because car dealers can identify through the pricing software the market price, the listed price best reflects the market price, and it would be unusual for a dealer to accept a lesser price without shifting its profits to other components of the transaction.

There are a couple of additional reasons for this. First, other car dealers are considering the same vehicle and are using the same pricing and appraisal tools to determine the market price and to determine the reconditioning costs. This is what makes the profit margins so tight. If a car dealer

---

[1] There are other, less common avenues of acquiring vehicles. But the explanation in this Report applies in the same way.

4

is only willing to acquire a vehicle if he can expect to make a significant profit, he will rarely be able to acquire a vehicle because other car dealerships will be willing to tolerate a lesser profit margin, and will be willing to spend more to acquire the vehicle.

Second, unless the car is extremely rare or antique or what have you, the car dealer cannot just list the vehicle at above-market price in hopes of making a larger profit (with the understanding that he or she will likely have to negotiate down from the price and make a lesser profit), because of Internet shopping and comparison tools that consumers have access to. If a car dealer lists a 2020 Honda Civic for $20,000.00, and another dealership lists an otherwise identical 2020 Honda Civic for $19,000.00, the first dealership is not going to be able to make a larger profit because consumers will not even come to the dealership.

Now, that does not mean all 2020 Honda Civics in a given market will be listed at the exact same price point. This is because 2020 Honda Civics are probably never going to actually be identical. One might be white, and another green. One might have 17,000 miles, and another 30,000. One might have been in a minor accident, which shows up on the Carfax. Car dealers account for those differences and so do consumers.

But just like consumers can compare the prices of comparable vehicles in the market (along with differences in mileage, color, options, etc.) so can car dealers. I talked before about there being one Honda Civic for $20,000.00 and another for $19,000.00. Because car dealers price to market, this would mean there was some reason for the difference of $1,000.00—a difference in mileage, for example. A consumer cannot leverage the $19,000.00 vehicle against the $20,000.00 vehicle because the car dealer already knew about the $19,000.00 vehicle and chose to list his or her Honda Civic for $1,000.00 higher. He or she would only do so if there were a good reason for the vehicle to sell for an extra $1,000.00 (it had less mileage, for example). Which means a consumer telling the dealer about the $19,000.00 does not mean he or she will negotiate down from $20,000.00. Especially because the dealership knows that the consumer could just purchase the $19,000.00 vehicle—why try to convince the dealership to reduce from $20,000.00 to $19,000.00 rather than just purchasing the $19,000.00 vehicle? Generally, the factors dealers consider in setting the price (other than the data accessed through V-Auto) is (1) mileage, (2) condition, (3) wear and tear, and (4) reconditioning, such as whether it has a brand new set of tires.

**2. Mitchell Uses the Same Process as Used Car Dealers, Except for the Projected Sold Adjustment.**

I have looked at the Mitchell Market Valuation Report and analyzed the method for arriving at the vehicle value. (I understand from talking to counsel that this same general process is used for all total-loss vehicles in Arizona. If that happens to not be true, it does not change my opinions about the used auto market.)

My understanding from reviewing Plaintiffs' Market Valuation Reports is that Mitchell finds comparable vehicles and identifies their advertised price. Using Mr. Ambrosio's Market Valuation Report as an example, Mitchell identified the listed price of five 2011 Chevrolet Malibu 4 Door Sedans advertised for sale within 75 miles of Plaintiff Ambrosio's location. Mitchell then applies an adjustment for mileage—in Mr. Ambrosio's case, the comparable vehicles had more or

5

less mileage than the loss vehicle, so adjustments were made accordingly. Mitchell then applied positive and negative adjustments to account for differences in equipment between Plaintiff Ambrosio's vehicle and the comparable vehicles. Mitchell also determined Mr. Ambrosio's vehicle was in an overall condition less than "Typical Vehicle Condition" and applied a downward adjustment of $917.15 to reflect that.

Mitchell also applied a "Projected Sold Adjustment" ("PSA") to the listed price of all five comparable vehicles, which it says is "an adjustment to reflect consumer purchasing behavior (negotiating a different price than the listed price)." My understanding based on conversations with counsel is that the PSA is determined by comparing list prices of vehicles from online classified advertisements and attempting to match them to a reported sales price that is reported from JD Power's Power Information Network.

In Plaintiff Ambrosio's Market Valuation Report, Mitchell applied a $807.00 PSA deduction to comparable vehicle 1. Comparable vehicle 2 had a $666.00 PSA deduction taken. Comparable vehicle 3 had a $761.00 PSA deduction taken. Comparable 4 had a $570.00 PSA deduction taken. Comparable 5 had a $808.00 PSA deduction taken. My assumption is that Progressive Preferred Insurance Company and Progressive Advanced Insurance Company (collectively "Progressive") and Mitchell must believe that the average consumer negotiates a sales price that is on average 9.5% lower than the listed prices for the 2011 Chevrolet Malibu 4 Door Sedans (at least during the timeframe and in the market areas in question—June 2020 to August 2020).

In my opinion, application of a PSA deduction is directly contrary to reality in the used auto market. What is notable to me, however, is that except for the PSA deduction, used car dealers and Progressive are using essentially the same process to price (in the dealer's case) and value (in Progressive's case) used autos. What I mean is that, like Progressive, car dealers utilize appraisal tools to determine the condition of vehicles. It is based on these appraisal tools that car dealers figure out how much the reconditioning cost is going to be. Just like Progressive, car dealers use software and databases to identify the listed price of comparable vehicles. And, just like Progressive, car dealers use software to identify not only the differences in equipment between the comparable vehicles and (in the dealer's case) the vehicle they are considering acquiring, but also the impact of factors of mileage, equipment, and vehicle configuration. (The difference, as to equipment, is that V-Auto and similar programs, such as First Look, already filter based on equipment. This means that the impact on market value that a certain vehicle package has does not need to be separately adjusted.)

In other words, Progressive is essentially using the same method and same sources to value vehicles as car dealers use to price vehicles. Mitchell and Progressive assume that car dealers go through that process, identify a market price, and then advertise the vehicles above that market price on the off chance of finding someone willing to pay more than the market price but willing (and expecting) to negotiate down. For the reasons I already explained, that just is not true.

3. **What could explain why a vehicle might sell for less than the listed price?**

6

In this section and the next, I discuss the reasons why the sold price of a vehicle might be reported either lower or higher than the listed price and, more importantly, whether it is because the listed price was "wrong" in that it was either higher or lower than the true market price (meaning the sold price reflected the true market price) or because the listed price was "right" and the purchaser simply paid more or less than the true market price.

I was asked if vehicles ever sell for less than their listed price and, if so, why that would be, with the specific question of whether dealerships might sell for less than listed price if the customer is willing to finance the purchase through the dealership.

The answer is "yes, but it's complicated." Based on my experience with hundreds of car dealers in markets across the country, car dealers generally stick to the advertised price but might make concessions if they can shift the profit because they are getting points arranging financing, the customer is also purchasing ancillary products such as extended warranties or service plans, or the customer has a desirable trade.[2] Note that lenders will sometimes cap the amount they will lend for a vehicle. This means that if the car is listed at $20,000.00, the bank will not lend more than $21,000.00, and the consumer wants to purchase an extended warranty at $1,500.00.  For dealerships, the most profitable products are typically those sold in the Finance & Insurance departments. So, if the dealer has to reduce either the price of the vehicle or the price of the product—by $500.00 in the above example—it is often in their financial interest to lower the price of the vehicle rather than pass on the sale of the extended warranty.

And even though dealers try to stick to the advertised price even if the consumer is financing the purchase through the dealership, it is true, in my opinion, that dealers will sometimes adjust the sales price if they're making money on the financing. The reasons are pretty clear. If the options are a cash purchase for $20,000.00 or a financed purchase for $19,700.00, it is better financially for the car dealer to do the financed purchase because they will more than make up for the difference in interest. In a really great market, the car dealer will probably not negotiate down even for a financed purchase, but in a slow market they might be willing, especially if the vehicle has been sitting on the lot for longer than expected.

There are a few other reasons, in my opinion. The first would be if there was a trade-in vehicle as part of the deal. If the vehicle is a desirable one that can be sold at retail, the car dealer might be willing to shave a few hundred bucks off the listed vehicle to get the trade—in other words, the dealership might be willing to sell at a below-market price in order to get the trade-in vehicle. Or even if it's not necessarily a very desirable trade-in vehicle, if a consumer wants to negotiate off the advertised price, the car dealer can just offer less for the trade-in than he or she otherwise would have, because it all equals out from a profit margin perspective.

Acquiring trade-ins is an important part of the used auto industry. It allows dealers to acquire new inventory in the same transaction as a sale, without the need to incur cost or time going to auction and transporting new inventory to the lot. Taking trade-ins into inventory quickly

---

[2] This remained true during the COVID-19 pandemic. Because the market for used autos was so hot, dealers were even more inclined not to deviate from the advertised price even for financed purchases or those that include ancillary products.

7

provides the dealer yet another opportunity to profit from selling that vehicle above acquisition cost, arranging financing, or selling ancillary products. Equally important to the business model, the trade-in means the current customer is providing the opportunity for yet another customer, meaning two customers who will return for servicing. As discussed below, car dealers generally make a significant part of their profit through their service department.

A second reason why a vehicle might sell for less than its listed price would be a special discount. Most car dealers will give an employee discount, a friends/family discount, and some have loyalty programs for repeat buyers or service customers, and some dealerships will give, for example, military discounts. This would also be an explanation for why a vehicle would have sold for less than its advertised price.

A third reason stems from the fact that car dealers generally make a significant part of their profit through their service department. Some car dealers will allow customers to use a certain percentage of the money spent for services towards purchase of their next vehicle. For instance, a car dealer may have a program where 10% of money spent on services can then be counted as a credit on a purchase of the next vehicle, up to, say, $500.00 or so. The idea is that if car dealers keep customers buying from them, the customers will keep using their service department, which generates most of the profit anyways. In fact, especially in particularly hot markets, some car dealerships will try not to sell a vehicle to anyone who lives more than a given range of miles away from the dealership because they are less likely to get the profit generated by the service department for that vehicle.

And then the final reason is that a consumer might identify a defect in the vehicle that the car dealer had missed or because the inventory was damaged on the lot. At that point, the options are for the car dealer to (1) spend the money to fix the defect and then sell the vehicle at the market/listed price, or (2) just shave that amount off the purchase price, which the customer can then use the difference to fix the defect him or herself. Lots of customers prefer the second option because they think "their guy" can do it for less than the amount the dealership will spend fixing the defect.

All of these reasons have nothing to do with the actual market price of a vehicle. For cash purchases (which, as I said before, I'm using to include purchases where the customer gets his own direct financing, not through the dealership), there is simply no wiggle room. The vehicle is already priced at market. It is simply not how the industry operates anymore. Before the adoption of pricing tools, selling used cars was more of an art. Without modern pricing tools and with no Internet shopping and consumer comparison tools, negotiation was common. Now, it is a science—car dealers have access to multimillion dollar appraisal and pricing software and can identify precise market prices, and, if they don't, consumers will know it.

Finally, it is important to understand the context of the transaction. A dealership makes profit from the total deal and does not compartmentalize the profit into profit from a sale of vehicle in isolation. Rather the dealership looks to the profit it makes from the transaction as a whole, meaning the sale of the vehicle along with profits from the "backend" -- financing, trade-ins, and backend sales of high margin services and products. A deal is controlled and finalized by the sales

manager, not the salesman. And the sales manager's income (and the dealership's profit) is the product of not just the vehicle sale but also other backend high profit services sold by dealers through their finance and insurance ("F&I") departments. It is customary in the industry to train salespersons on a weekly basis to get the consumer to come into the dealership, including scripts and word tracks assuring the customer they will negotiate. For example, "We will not lose a car deal over price". But when it comes to structuring the deal, the salesman is a conduit to the sales manager, who controls the final deal price, which depends on the overall profit of the vehicle and ancillary product sales, financing and trade-in profits. For example, the invoice "sold" price of a vehicle can be adjusted as well as the term of the financing and the value of the trade in so that a buyers monthly payment reflects the add on profits from financing, trade-ins and the sale other products and services. Individual elements of a sales invoice (prices, financing, add on products) vary to reflect the buyer's cash budget or monthly payments the buyer can afford from the deal as a whole— not just the vehicle value element of the sale. To determine if the reported sold price actually reflects the market value of a vehicle where the sale price is different than the advertised price, one would need to analyze the deal jacket for that specific transaction.

Pricing and selling vehicles nowadays is all about crunching numbers, identifying the correct market amount, and then selling that vehicle for that amount. The idea that car dealers set prices above the market and then negotiate down from that price is antiquated.

**4. Why would a vehicle sell for more than its listed price?**

I was also asked if vehicles ever sell for more than the listed price and, if so, why that would be.

The answer is yes. One example would be that car dealers will sometimes advertise the vehicle at less than its market price but with disclaimers that make clear the price is not a generally available cash price. For example, a car dealer might advertise a vehicle for $18,000.00, but explain that this assumes the purchase will be financed through the dealership, while a cash purchase/third-party financed purchase will include an extra $1,000.00. If a consumer pays cash or gets their own financing, then the vehicle will have sold for more than its "advertised" or "listed" price.

Another example might be that the consumer wants an added package or aftermarket part added that is installed by the dealership. Assume for example that a vehicle with cloth seats is listed at $18,000.00. The consumer wants leather seats, and so the dealership makes that change and sells the vehicle for, say, $19,000.00. In this scenario, the purchase price would be higher than the list price.

To sum up, I will go through each example where a sold amount might be different than listed amount and identify for each one whether it is because (1) the listed price was "wrong", i.e., the listed price was higher or lower than the true market price; or (2) the listed price was "right", i.e., the listed price equaled the true market price, and the customer simply paid more or less than market value.

9

**Example No. 1 (capped total lending amount)**: A customer wants to purchase a $20,000.00 car and a $1,500.00 warranty, but can only get $21,000.00 in lending, so the dealership lowers the vehicle price to $19,500.00. It is not that the listed price was wrong and the market price was actually $19,500.00; it is that the dealership sold a vehicle for $500.00 less than its market value because it was better financially to get the full warranty amount than it would have been to just sell the vehicle for its market value. The listed price was the market price and the purchase price was less than true market price (but the customer ultimately paid and the dealership received more than the true market price because of the financial arrangement).

**Example No. 2 (financing through the dealership)**: A vehicle is listed at $20,000.00, but a car dealership agrees to sell it for $19,800.00 because the customer agrees to finance through the dealership. It is not that the listed price was $200.00 off and the real market price/value was lower. It is just that the car dealership was willing to sell for less than market value because it would make more profit than had it sold the vehicle for its cash market price or via the customer's private lending. The listed price was "right" and the purchase price was less than true market price because the car dealer was financially incentivized to sell for less than market value.

**Example No. 3 (desirable trade in)**: If a car dealership is willing to sell a vehicle for less than the advertised price in order to acquire a desirable trade-in, this does not mean that the listed price was higher than the market price. It just means that the car dealership was financially incentivized to accept less than market value. The list price was "right" and purchase price was less than true market value because the dealership had an opportunity to make additional profit on the customer's trade-in.

**Example No. 4 (special discount)**: This one is perhaps the most obvious—if a person gets a special discount (such as an employee discount or through a loyalty program) this doesn't mean the listed price was higher than the true market price. The listed price was "right" and purchase price was less than true market price because customer was entitled to a discount off the market price.

**Example No. 5 (incentivizing use of service department)**: If a customer applies "credit" from use of the service department to get a discount off the purchase of a vehicle, this, again, obviously does not mean the listed or advertised price was higher than true market value. It just means the customer was able to use a program and pay less than market price. The listed price was "right" and purchase price was less than true market price because customer was entitled to a credit against the market price.

**Example No. 6 (customer identifies defect)**: I'll use a hypothetical where a vehicle is listed for sale at $20,000.00, and a potential purchaser identifies a defect that the car dealership had missed, which will cost $2,000.00 to fix. If the dealership and customer agree that rather than the dealership fixing the defect and then selling the vehicle to the customer, they will just shave $2,000.00 off the $20,000.00, this does not mean the listed price was higher than the true market price *had the vehicle not been defective*. It just means that rather than spending the $2,000.00 to fix the defect and then selling it for its market price, the dealership sold the vehicle for less than its market price because it was defective. The listed price was "right" for the vehicle *without the*

10

*defect* but the customer discovered a defect that had not been accounted for and the vehicle sold for the market value of the vehicle **with the defect**.

**Example No. 7 (listed with asterisk)**: This refers to those situations where there is a listed price, but with an asterisk which then explains that the advertised price assumes a specific financing arrangement, for example (or perhaps assumes, say, that a trade-in will be involved). This is the only situation in which the listed price is purposely "wrong" and the purchase amount, not the listed amount, better reflects the true market value.

**Example No. 8 (added package or aftermarket part)**: Here, the list price was "right," i.e., it reflected true market price, for the vehicle as advertised, but the purchase price will be higher because the vehicle was not sold as advertised—it was improved by the package/part and then sold for a higher price.

My understanding is that in calculating the Projected Sold Adjustment, Progressive considers transactions where a vehicle sells for less than the listed price but does not consider transactions where the vehicle sells for more than the listed price. If that's true, it makes no sense. If anything, it should be the opposite. If a vehicle is sold for less than the listed price, this is because either the dealer was financially incentivized to "sell" the vehicle for less than true market price, or because the customer was entitled through discount or credit to pay less than true market price. By contrast, if the sold amount is higher than listed amount, this might be because the purchaser paid more than true market price of the advertised vehicle (the added package example) but it also might be because the listed price was "wrong" and the sold amount is the actual true market price.

   **5.   Is the true market price reflected by listed amounts or sale amounts?**

As I assume this Report has already made clear, car dealerships identify the market price of a vehicle and then list the vehicle for that amount. This means that, in the used car industry, the listed price reflects the market price. In a cash purchase (or private third-party lending), the listed price and sold price will likely be the same, as explained in this Report. Oftentimes, the sold price will be higher or lower than the listed price for the reasons already discussed—entitlement to a discount, listing with asterisks, ancillary products that together exceed the capped total lending amount, and so forth. But in virtually all these situations, that is because the vehicle was "sold" for either less or more than the actual market price.

One other point is worth mentioning. A car dealership may need to turn inventory to make room on the lot for incoming vehicles. To do this, the car dealership will identify the market price but list the vehicles at a discounted amount off that market price. This means that the possibility of getting a discount or good deal is already baked into the listed prices at any given time. But this has nothing to do with a consumer's ability to negotiate.

None of this is to say that in my opinion, there has never been a single situation in the last decade where a car dealership negotiated off the listed price even for a cash purchase/private third-party financed purchase. For rare vehicles where there are few comparables in a given area, maybe the car dealership just got the price wrong, as an example. Or maybe the buyer mentions they will shortly be looking again to buy a vehicle for their spouse and another one for a child who is turning

11

18, and so the dealership is willing to negotiate a bit in hopes of being able to sell two more vehicles, and potentially two more warranties, service plans, and opportunities to obtain financing. But these would be unusual circumstances—and usually would reflect a discount off of market price, not that the listed price was higher than the true market price.

### 6. What, if any, impact did COVID-19 have on the used car industry?

One final question I was asked to address was the impact that COVID-19 has had on the used car industry. To sum it up, COVID-19 impacted the price of vehicles, but not pricing practices. In other words, it impacted the amount for which vehicles could be sold, but not the way vehicles are priced, and it has not changed the fact that dealers do not negotiate off of listed price.

During COVID-19, for the first time I can recall, used vehicles actually appreciated in value, rather than depreciating, at times. And because of the shortage in chips and new vehicles, the value of used vehicles in general increased. Also, dealerships became less likely to offer discounts such as loyalty discounts.

The inventory tools used by dealerships (V-Auto) reflect real time market pricing data. The pricing reflects what is actually happening in the market and how it has been impacted by COVID-19.  Rental car companies building their fleets with used cars drive prices up.  A shortage of new car inventory drives used car pricing up for late model used cars.  And an overall shortage of used car inventory is driving prices higher.  The pricing model is the same, but the prices are transacting at a higher level.

But conceptually, COVID-19 did not change the method by which vehicles are priced, which I described earlier. Car dealerships priced vehicles to market before COVID, and they did so during COVID. Meaning COVID did not impact (1) how vehicles are priced, or (2) whether car dealerships negotiate from listed prices. It just meant that the listed prices were higher than they would have been if COVID hadn't happened.

### 7. Review of the graphs of data analysis by Dr. Jeffrey Martin and Dr. Michelle Lacey

The Martin figures show that vehicles typically sell for the advertised price.  In other words, it is the most common outcome by far in all the figures. Otherwise, the figures show a roughly equal amount of sales transactions where the reported sold amount is less than or more than the list price captured from the internet.  And the curve tapers down roughly the same on each side of the curve. The Lacey figure is very similar, except there is no data on the right side of the figure.  It is my understanding that is because Mitchell does not retain the data for transactions where the sold amount exceeds the advertised or list price. This large spike in the middle of the figures is what I would anticipate seeing, and it is consistent with standard industry practices of pricing to market discussed above. It is my understanding that Mitchell does not consider the transactions where the sold amount is higher than the advertised price and, until July 2021, did not consider the transactions where the sold amount matches the list price. I further understand that Mitchell presumes any difference between the advertised price and the sold amount results from a

negotiation in a cash transaction. It is wrong to presume that a price moved down or up based on a negotiation on a cash price or that any movement is based on the value of the vehicle rather than the other aspects of the deal or back end that I discuss in previous sections (moving profit to another aspect of the deal such as financing or trade in). To try to understand *why* the sold amount moved off of list price (again either up or down) one would need to look at the deal jacket and all aspects of the deal (e.g., financing, trade-ins, warranties, special discounts, etc.) In addition, one needs to look at any time lag between the captured list price and the date of sale, as the captured price may not have been the advertised price on the date of sale, and in the interim, the vehicle may have depreciated or appreciated due to time and/or local supply and demand.

V.  **Publications, Prior Testimony, and Statement of Compensation**

I am being compensated at a rate of $695.00 per hour. I have previously offered expert testimony in *Freeman v. Progressive Direct Insurance Company*, Case No. 1:21-cv-03798-DCC (D.S.C.); *Drummond, et al. v. Progressive Specialty Insurance Company, et al.*, Case No. 5:21-cv-04479-EGS (E.D. Pa.); *Chadwick v. State Farm Mutual Automobile Ins. Co.*, No. 4:21-cv-1164-DPM (E.D. Ark.); *Wiggins, et al. v. State Farm Mutual Automobile Ins. Co.*, No. 8:21-cv-03803-DCC (D.S.C.); *Costello v. Mountain Laurel Assurance Co.*, No. 2:22-cv-00035-TAV-CRW (E.D. Tenn.); *Brown v. Progressive Mountain Ins. Co.*, No. 3:21-cv-00175-TCB (N.D. Ga.). I have not previously published in my area of expertise.

Executed on:   June 22, 2023

By: *Kirk Felix*
Kirk Felix (Jun 22, 2023 17:13 EDT)

Kirk Felix

# EXHIBIT 1

# Kirk Felix
## Executive Moderator/Consultant
913-485-6963
kirkfelix1@gmail.com
5401 Banana Point Drive Okahumpka, FL 34762

---

## Career Summary
Results-driven automotive management consultant with over 23 years of experience diagnosing a range of dealership profit and process issues. Instrumental in a dynamic environment of sharing and implementing best practices in the automotive environment. Consulted with over 300 clients with a 99.8% satisfaction rating.

---

## Qualifications
- 41 years of automotive management experience
- Strong leadership skills – Unique ability to motivate a group of A-type personalities to work together
- Proficient knowledge of dealership operations and profitability
- Ability to analyze dealership profitability opportunities
- Skill set to drive dealership profitability to 30% net to gross
- Strong presentation and communication skills

## Professional Experience

### Automotive Dealership Buy/Sell Broker
<u>Performance Brokerage Services</u> – Irvine, CA    January 1, 2023 to Present
- Responsible for assisting dealers to buy and/or sell dealership business and real estate

### Automotive Executive Moderator/Consultant
<u>NCM Associates Inc</u>. – Kansas City, MO    July 1999 to September 2022
- Effectively ran automotive 20 groups to improve overall dealership profitability and operations
- Consistently in the top four revenue producers with revenue in excess of $1,000,000 annually
- Worked with individual dealerships to identify areas of profit and process opportunities
- Held dealers accountable for continued improvement to achieve 30% net to gross
- Worked with top performing dealers to inspire improvement within the 20 group

### Fixed Operations Director
<u>Gwinnett Place Honda</u> – Duluth, GA    March 1998 to July 1999
- Improved CSI from 88.1 to 90.8
- Increase service capacity 20% by implementing technician training program
- Improved Fixed First Visit from 72.7 to 86.7

### Service Director
<u>Toyota of Cerritos</u> – Cerritos, CA    November 1997 to March 1998
- Increased total gross profit from $280,000 monthly to $320,000 monthly
- Implemented numerous processes to increase capacity and CSI
- Analyzed entire service operation and developed a 12-month plan for improvement

### Service Director
<u>Norm Reeves Acura and Honda Superstore</u> – Cerritos, CA    June 1991 to November 1997
- Achieved number one ranking in the nation for C/P and total service volume
- Increased CSI from 76.8 to 91.0
- Increased total C/P repair order count by 61.3%, an average of 15.3% per year
- Effectively hired, trained, motivated, and managed a staff of over 100 employees
- Increased service capacity by over 70% to effectively handle over 150 customer cars per day

### District Service Manager
<u>American Honda Motor Company, Inc</u> – Torrance, CA   July 1986 to June 1991
- Improved the district's CSI rating, service profitability, and initial quality to an all-time high
- Increased customer paid labor sales 20%
- Rated number one in the nation for customer satisfaction
- Involved in guest speaking and recruiting at both university and trade school levels

---

## Education

**Bachelor of Science – Business**        May 1986
University of Colorado - Denver